PEOPLE v MARKS

PEOPLE v PAMELA HOLMES

Docket Nos. 79338, 80346. Submitted January 9, 1986, at Lansing. Decided October 7, 1986.

Ervin J. Marks and Pamela P. Holmes were convicted in Genesee Circuit Court of breaking and entering an unoccupied building and were sentenced, Marks to a prison term of from five to ten years and Holmes to a term of from thirty months to ten years, Harry B. McAra, J. Both defendants appealed. The appeals have been consolidated.

The Court of Appeals *held:*

1. The subjection of defendant Marks to an on-the-scene identification procedure without the benefit of having counsel present did not violate Marks' right to counsel.

2. Defendant Marks' argument that he was denied a fair trial by the people's failure to adequately preserve and test wood chips and white particles found on his clothing is without merit.

3. The evidence against Holmes was clearly sufficient to convict her on an aiding and abetting theory. The trial court did not err in denying her motion for a directed verdict.

4. The trial court did not consider Holmes' failure to admit guilt when sentencing her.

5. The trial court did not err by departing from the sentencing guidelines' recommended minimum range for reasons that were already factored into the guidelines' scoring system.

6. The trial court did not abuse its discretion in sentencing Holmes to the extent that the conscience of the Court of Appeals is shocked.

Affirmed.

REFERENCES

Am Jur 2d, Appeal and Error §§ 880-883.

Am Jur 2d, Criminal Law §§ 595 *et seq.,* 798.

Am Jur 2d, Trial §§ 30, 31.

See also the annotations in the Index to Annotations under Evidence; Sentence and Punishment.

1. Criminal Law — Eyewitness Identification — Right to Counsel.

A suspect, moments after the commission of a crime, may be subjected to a prompt on-the-scene identification procedure without the presence of counsel where the evidence against the suspect is not very strong and the procedure is not so suggestive as to render the identification unreliable.

2. Criminal Law — Evidence — Lost Evidence.

A loss of evidence which occurs before a defense request for the evidence does not mandate reversal of a conviction where there is no showing of bad faith or intentional misconduct or suppression.

3. Appeal — Evidence — Sufficiency of Evidence.

The Court of Appeals, in reviewing a claim that the evidence against the defendant was not sufficient to support a conviction, must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.

4. Criminal Law — Sentencing Guidelines.

The use of the sentencing guidelines when imposing a sentence for an offense included in the guidelines is mandatory, but imposing a sentence based on the recommended ranges of the sentences is not; a judge may depart from the recommended minimum range for the reasons, and in the manner, prescribed by the guidelines.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Robert E. Weiss,* Prosecuting Attorney, *Donald A. Kuebler,* Chief, Appellate Division, and *Edwin R. Brown,* Assistant Prosecuting Attorney, for the people.

*Steven W. Moulton,* for Ervin Jovan Marks.

*Francine Cullari de Sanchez,* for Pamela Patrice Holmes.

Before: WAHLS, P.J., and MACKENZIE and R. TAHVONEN,* JJ.

WAHLS, P.J. Defendants were convicted of breaking and entering an unoccupied building, MCL 750.110; MSA 28.305. Marks was sentenced to a prison term of from five to ten years. Holmes was sentenced to a term of from thirty months to ten years. Both defendants appeal as of right.

On November 5, 1983, at approximately 5:53 A.M., an alarm came in from Jan's Hair Fashions to the Silent Alarm Company. The Flint Police Department was immediately contacted and Officers Thomas Hilgendorf and Joel Florida were dispatched to Jan's. As the officers pulled into Jan's driveway, Hilgendorf saw two individuals standing four to six feet in front of the side door. The two ran in opposite directions upon sighting the police. Hilgendorf apprehended Holmes while Florida caught Marks. Florida observed perspiration on Marks' face and neck, and wood chips and ceiling tile fragments on his hair, neck and clothing. After apprehending the two suspects, the officers checked the building and saw scuff marks on the east rear wall.

Tauheed Mateen, an employee of Church's Fried Chicken, located across the lot from Jan's, was closing the restaurant at the time. Looking out of the restaurant's window, he saw a tall, slim man with a long afro, dark pants and a jacket disappear behind Jan's and later come out of Jan's and walk around the building while carrying a bag. He next saw the police car arrive and observed the officers get out of the cruiser. However, he did not see a woman at the scene nor did he see the officers chase anyone. After the officers had placed Marks and Holmes in the police car, Mateen ap-

---

* Circuit judge, sitting on the Court of Appeals by assignment.

proached the officers and told Officer Florida that he saw who broke into Jan's. Florida asked if the person Mateen saw was the man in the cruiser (Marks) and Mateen responded affirmatively. On cross-examination at trial, Mateen admitted that he was unable to see the suspect's face from the restaurant because he was too far away.

Rodney Simpson, the husband of the owner of Jan's, arrived at the scene and unlocked a door. He entered the building with Officers Florida and Hilgendorf, observed a number of wastepaper baskets filled with beauty equipment, and further noticed that a portable television set and radio were missing. At that time, Simpson also discovered a square hole in the bathroom ceiling, which was made of one-inch thick plywood. Later that day, Simpson found a claw hammer and a screwdriver. These tools did not belong to Simpson, his wife or any of the store's employees.

Marks and Holmes were transported to the police station, where Officer Hilgendorf also observed wood chips in Marks' clothing and a white powdery substance and pieces of white ceiling tile on his pants. The clothing was stored in an evidence locker, "bunched together." As a result, when the clothing was produced at trial, it did not contain all the wood chips and other particles as they were observed at the crime scene. The police did not conduct a laboratory analysis to determine if the particles on the clothing matched the material from Jan's bathroom ceiling.

Marks and Holmes were interviewed separately at the station. Sergeant Acy Butler testified that he interviewed Holmes from approximately 6:30 to 7:00 A.M. on November 5, 1983. After waiving her *Miranda*[1] rights, Holmes told Butler that, at the

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

time of her arrest, she was passing by Jan's with Marks while on the way to the E-Z Stop party store to purchase diapers and milk for her baby and that she knew nothing about the break-in. Butler next interviewed Marks, who corroborated Holmes' account. At trial, an employee of Jan's testified that the E-Z Stop store is six blocks away from Jan's and is closed from approximately 2:00 A.M. to 7:00 A.M.

Both defendants took the stand on their own behalves and insisted that they knew nothing about the burglary. Holmes testified that during the evening of November 4, 1983, she went to the home of Marks' father because she needed money to purchase diapers and milk. During this time, her upstairs neighbor watched her children. Because Marks was not at his father's home at the time she arrived, Holmes left a message and returned to her residence. Marks' father corroborated this testimony and further stated that he refused to lend Holmes money because she was already in debt to him.

Meanwhile, Marks was at the Dirty Disco, an afterhours nightclub. Upon returning to his father's home early in the morning of November 5, 1983, his father gave him Holmes' message and lent him $10. Marks went to Holmes' residence and the two went to the E-Z Stop store. On the way to the store, the two approached Jan's. Holmes decided to take a shortcut across the lot behind Jan's and agreed to meet Marks again in front of the Church's restaurant. Both defendants testified that, while Holmes was behind Jan's and Marks was in front of the building, the police officers arrived and immediately placed them under arrest. According to Marks, he and Holmes decided to go to the E-Z Stop store because they had seen a 24-hour sign in front of that store and

they knew that the other stores nearby would be closed. Marks also explained that his clothing contained wood chips at the time of his arrest because, the night before the arrest, he put plywood on a table top for Roger Brownlee. Marks stated that he wore his dirty work clothes to the Dirty Disco, he did not run away from Officer Florida, and, contrary to Florida's testimony, he was not sweating or breathing heavily at the time of his arrest. Brownlee corroborated that Marks did indeed do carpentry work for him the day before, but this involved only the construction of steps for a trailer.

I

Defendant Marks argues that he should not have been subjected to the on-the-scene identification procedure without the presence of counsel. He asserts that the procedure as conducted violated his Sixth Amendment right to counsel. We disagree.

A

Actually, the Sixth Amendment does not apply to the "pre-indictment" identification in this case. The basis for defendant Marks' assumption that it does is easily documented. In *People v Anderson,* 389 Mich 155, 168; 205 NW2d 461 (1973), our Supreme Court concluded that defendants are entitled to counsel at all pretrial identification procedures, on the basis of *United States v Wade,* 388 US 218; 87 S Ct 1926; 18 L Ed 2d 1149 (1967). Considering that *Kirby v Illinois,* 406 US 682; 92 S Ct 1877; 32 L Ed 2d 411 (1972), contained no majority opinion, our Supreme Court concluded that *Kirby* provided no basis for distinguishing

between "pre-indictment" and "post-indictment" cases. 389 Mich 171. The Court acknowledged that justifications for the absence of counsel did exist and identified three:

> (1) "intelligent" waiver of counsel by the accused, see *e.g., People v Shipp,* 21 Mich App 415 [175 NW2d 529] (1970); (2) emergency situations requiring immediate identification, see *e.g., People v Adams,* 19 Mich App 131, 133 [172 NW2d 547] (1969); (3) prompt, "on-the-scene" *corporeal* identifications within minutes of the crime, see *e.g., Russell v United States,* 133 US App DC 77; 408 F 2d 1280 (1969). [389 Mich 187, n 23. Emphasis in original.]

Since *Anderson,* the question of on-the-scene identification has been raised in the context of the "constitutional right to counsel," see e.g., *People v Wilki,* 132 Mich App 140, 142; 347 NW2d 735 (1984), and specifically the "Sixth Amendment right to counsel," see e.g., *People v Fields,* 125 Mich App 377, 380; 336 NW2d 478 (1983); *People v Turner,* 120 Mich App 23, 33-34; 328 NW2d 5 (1982), lv den 417 Mich 1064 (1983); *People v Coward,* 111 Mich App 55, 62; 315 NW2d 144 (1981), lv den 417 Mich 873 (1983).

While *Anderson* and the above cases from this Court at first glance appear to be Sixth Amendment cases, further inquiry reveals otherwise. In *People v Jackson,* 391 Mich 323, 338; 217 NW2d 22 (1974), the Supreme Court observed that the *Anderson* rules "represent the conclusion of this Court, independent of any Federal constitutional mandate, that, both before and after commencement of the judicial phase of a prosecution, a suspect is entitled to be represented by counsel at a corporeal identification." Furthermore, were *Anderson* a statement of Sixth Amendment law, it

would no longer be controlling, because the United States Supreme Court has since approved of the distinction drawn by the *Kirby* plurality but rejected in *Anderson.* In *Moore v Illinois,* 434 US 220, 226-227; 98 S Ct 458; 54 L Ed 2d 424 (1977), the Court said,

> In *Kirby v Illinois,* 406 US 682 [92 S Ct 1877; 32 L Ed 2d 411] (1972), the plurality opinion made clear that the right to counsel announced in *Wade* and *Gilbert* attaches only to corporeal identifications conducted "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." 406 US, at 689. This is so because the intiation of such proceedings "marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Id.,* at 690. Thus, in *Kirby* the plurality held that the prosecution's evidence of a robbery victim's one-on-one stationhouse identification of an uncounseled suspect shortly after the suspect's arrest was admissible because adversary judicial criminal proceedings had not yet been initiated. In such cases, however, due process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures. *Id.,* at 690-691; *Neil v Biggers,* 409 US 188 [93 S Ct 375; 34 L Ed 2d 401] (1972); *Stovall v Denno,* 388 US 293 [87 S Ct 1967; 18 L Ed 2d 1199] (1967); see generally *Manson v Brathwaite,* 432 US 98 [97 S Ct 2243; 53 L Ed 2d 140] (1977).

See also *Summitt v Bordenkircher,* 608 F2d 247 (CA 6, 1979), aff'd sub nom *Watkins v Sowders,* 449 US 341; 101 S Ct 654; 66 L Ed 2d 549 (1981).

The question then is not whether defendant Marks was deprived of his Sixth Amendment right to counsel, but whether the right to counsel estab-

lished by *Anderson* was violated. As noted earlier, *Anderson* recognized that the absence of counsel is justified where a prompt, on-the-scene corporeal identification is held. We turn our focus now to that justification.

**B**

As an example of the "on-the-scene" justification, *Anderson* cited *Russell v United States,* 133 US App DC 77; 408 F2d 1280 (1969), cert den 395 US 928; 89 S Ct 1786; 23 L Ed 2d 245 (1969). The facts of the latter case are as follows:

> At day-break on June 28, 1967, one George McCann investigated the sounds of a blaring radio and breaking glass at the Community Shoe Shine shop. The radio was sitting on the sidewalk outside the broken shop window. Stationing himself in a brightly-lighted gas station across the street, he saw a man emerge from the shop, look across at him, and proceed past him up the street. McCann went directly to a nearby police station and reported the incident three or four minutes after it occurred. The police broadcast a radio look-out, and officers in a responding squad car promptly encountered appellant in the vicinity. Since he matched the radioed description of the suspect and fled from the approaching police car, the officers pursued him to the porch of a house. There they discovered that he had a radio in one hand and a hatful of cigarettes and small change concealed under his coat. He also had a coat hanger and a screwdriver in his pocket, and on this particular summer night he was wearing gloves. They arrested him and drove him to the shoe shine shop where McCann identified him as the man he had seen coming out of the shop. [133 US App DC 78; 408 F2d 1281.]

Chief Judge Bazelon, writing for the majority,

wrestled with the implications of *Wade* (the Supreme Court had not yet decided *Kirby* or *Moore*). He recognized that the facts before him were quite different than those of *Wade*, stating,

> The present case, however, involves an immediate on-the-scene confrontation 5 o'clock in the morning when there would necessarily be a long delay in summoning appellant's counsel, or a substitute counsel, to observe a formal lineup. Such delay may not only cause the detention of an innocent suspect; it may also diminish the reliability of any identification obtained, thus defeating a principal purpose of the counsel requirement. [133 US Ap DC 80-81; 408 F2d 1283-1284.]

He then considered and balanced the suggestiveness of the identification procedure and the limitations of human perception and recognition and concluded:

> [I]t appears that prompt confrontations in circumstances like those of this case will "if anything promote fairness, by assuring reliability . . . ." This probability, together with the desirability of expeditious release of innocent suspects, presents "substantial countervailing policy considerations" which we are reluctant to assume the Supreme Court would reject. We therefore conclude, with some hesitation, that *Wade* does not require exclusion of McCann's identification.
>
> This conclusion does not rest on a determination that McCann's identification was in fact especially reliable. It rests instead on a general rule that it is not improper for the police immediately to return a freshly apprehended suspect to the scene of the crime for identification by one who has seen the culprit minutes before. [133 US App DC 81; 408 F2d 1284.]

Judge Danaher, concurring, noted that the thor-

oughly experienced trial judge had characterized the circumstances as the strongest case of identification he had observed in sixteen years on the trial bench. 133 US App DC 83, n 3; 408 F2d 1286, n 3.

I find the *Russell* analysis and rule persuasive. However, the simplicity of the *Russell* rule has not been accepted by this Court. The case was cited along with several other cases in *People v Hutton,* 21 Mich App 312, 322, 324; 175 NW2d 860 (1970), lv den 383 Mich 796 (1970), where this Court picked and chose elements from the various cases to support its conclusion that Hutton's identification constituted a "critical stage" in the proceedings. In subsequent cases, this Court has uniformly been suspicious of police motivation and necessity in conducting on-the-scene identifications. Nevertheless, a split has developed over the scope of the on-the-scene justification. One line of cases, beginning with *People v Turner,* 120 Mich App 23; 328 NW2d 5 (1982), lv den 417 Mich 1064 (1983), requires counsel when the police have "very strong evidence." The other line, exemplified by *People v Coward,* 111 Mich App 55; 315 NW2d 144 (1981), lv den 417 Mich 873 (1983), allows the police broad discretion.[2]

I disagree with those cases which say that *People v Coward, supra,* adopted a blanket rule allowing the police to conduct prompt, on-the-scene identifications without counsel under any circumstances. *People v Fields,* 125 Mich App 377, 381;

---

[2] Marks recognizes that *People v Dixon,* 85 Mich App 271; 271 NW2d 196 (1978), lv den 406 Mich 906 (1979), has never gained any support and he does not urge us to follow its "more than a mere suspicion" rule. We note that the two judges signing the *Dixon* majority opinion have since disaffirmed the rule and followed *Turner. People v Wilki,* 132 Mich App 140, 146; 347 NW2d 735 (1984) (MAHER, J., concurring); *People v Fields,* 125 Mich App 377, 382; 336 NW2d 478 (1983) (HOLBROOK, JR., J., concurring). The majority in *Wilki, supra,* p 143, n 2, persuasively demonstrated the problem with *Dixon.*

336 NW2d 478 (1983); *People v Raybon,* 125 Mich
App 295, 307; 336 NW2d 782 (1983), lv den 418
Mich 949 (1984); *Turner, supra,* p 35. In *Coward,*
the Court noted that there was nothing in the
record "to suggest that the police officers were not
attempting, in good faith, to decide whether there
was a reasonable likelihood that the suspect was
connected with the crime or merely an unfortu-
nate victim of circumstances." 111 Mich App 63-
64. *Coward* thus holds true to the long list of cases
cited therein which generally hold that the identi-
fication procedure must be on-the-scene *and* rea-
sonable police practice. See *People v Wright,* 38
Mich App 427, 431; 196 NW2d 839 (1972), lv den
388 Mich 758 (1972). I must acknowledge, though,
that *Coward* comes closest to stating a simple
proposition similar to the *Russell* rule, and for
that I applaud it.

I do not believe we need to go beyond *Coward*
and its predecessors and utilize the "very strong
evidence" rule of *Turner, supra.* Having said that,
I hasten to point out that this case does not
require a choice between *Coward* and *Turner.* For
reasons I will state later, the police did not have
very strong evidence against Marks and, therefore,
the identification was proper under either case.
Nevertheless, to stimulate further consideration by
bench and bar of this conflict in the case law, I
will address the problems I see with *Turner* and
its successors.

C

*Coward* was criticized in *Turner, supra,* p 36, n
1, and *Raybon, supra,* p 307, for not adequately
accounting for the inherent suggestiveness of the
on-the-scene identification. In both *Turner* and
*Raybon,* this Court then referred to *Russell,* pre-

sumably as an example of proper consideration of the inherent suggestiveness in the identification procedure. However, note that *Coward* suggests pretty much the same general rule as *Russell.* The fact that *Coward* did not discuss suggestiveness does not mean it was not accounted for. In fact, suggestiveness is one of the underpinnings of the *Russell* rule. *Russell* created the rule, *Coward* simply followed it. That *Coward* string cited its precedent, rather than "recreate the wheel," should not be construed as a failure to account for a necessary element expressed in that precedent.

*Turner* and the subsequent cases have accounted for suggestiveness twice over and reached, I believe, a wrong result. Suggestiveness was accounted for once in reaching the rule that defendant is entitled to counsel at a pretrial identification. That did not, however, prohibit a justification for the absence of counsel where the identification was prompt and on-the-scene. *Anderson, supra.* In *Turner* and its progeny, suggestiveness was then counted again to break down the "on-the-scene" rule further so that the justification for the absence of counsel exists only where there is less than "very strong evidence." This analysis is not suggested by *Anderson* and runs counter to the result in *Russell,* where the Court upheld the identification under circumstances constituting the strongest case of identification observed by the trial judge in sixteen years.

Much of the motivation behind the *Turner* rule seems to be the Court's effort to reconcile *People v Patskan,* 387 Mich 701; 199 NW2d 458 (1972), with the Supreme Court's later recognition of the on-the-scene identification exception in *Anderson.* In *Patskan,* the police arrived while the crime was in progress, observed a person flee, chased and caught him, and returned him to the scene of the crime,

where he was identified by the victim. There was some factual dispute whether the victim volunteered the identification or was asked by the police. This Court affirmed the defendant's conviction and, on the issue of his right to counsel at the identification, declined to address the merits where the issue was raised for the first time on appeal. The Supreme Court reversed on other grounds but addressed the right to counsel because the defendant's identification would be an issue on retrial. The Court addressed the matter very briefly and did not hint that there were any exceptions to *Wade.* Given the newness of the on-the-scene justification to this state at that time, see *People v Martin,* 42 Mich App 236; 201 NW2d 284 (1972); *People v Wright, supra; People v Hutton, supra,* I do not think it wise to infer that the Supreme Court in *Patskan* considered the justification or intended its opinion to be dispositive of the limitations of the justification. See *People v Dixon,* 85 Mich App 271, 283; 271 NW2d 196 (1978), lv den 406 Mich 906 (1979) (BASHARA, J., dissenting).

*Turner* also states that where the defendant is highly identifiable the exculpatory rationales for the police and the defendant are absent and counsel is that much more important. 120 Mich App 37. I agree that the police have less of a need to eliminate from suspicion a highly identifiable person. I do not understand, though, in what sense *Turner* means that in such a situation "counsel is that much more important." I think it sufficient that, although the police have less need of the identification, the identification is also less likely to deprive the defendant of a fair trial by leading to a wrong result.

Under *Russell* and *Coward,* if the identification is prompt and on the scene, suggestiveness is to be considered, not with respect to the right to coun-

sel, but in terms of the reliability of the identification and whether the defendant has been denied due process of law. Consideration of reliability is proper regardless of what standards or rules are used to determine the right to counsel.

In light of the due process protection provided a defendant undergoing an uncounseled on-the-scene identification, I cannot find a compelling need for the *Turner* rule. Furthermore, I do not believe the police can practically make a decision whether they have "strong evidence" or "very strong evidence." Sometimes it will be obvious, as where the defendant immediately confesses. However, standards such as "highly distinctive evidence of the crime" or "highly distinctive personal appearance," *Turner, supra,* pp 36-37, are going to end up requiring such a subjective determination by the police when confronted with complicated fact situations that the police will know no more than to act in good faith. This good faith entered into the definition provided in *Wilki, supra,* p 144, where this Court said:

> In view of the purposes for on-the-scene identifications, we interpret the term "very strong evidence" to mean evidence such that the police, acting in good faith, have no reasonable necessity for confirming that the suspect they have apprehended is in fact the perpetrator.

Unfortunately, I cannot understand what the rest of the Court's definition has to do with the strength of the evidence. In terms of police necessity, in every instance where the police have probable cause to arrest, they have the right to take the defendant to the station house, book him and begin judicial proceedings. Furthermore, if they are not sure they have the right person, they can still continue their investigation without first rul-

ing out that they have the wrong person. The release of the wrong person is more necessitous for that person than for the police, it would seem. The police are going to determine whether an on-the-scene identification is necessary, proper or reasonable based on the totality of the circumstances, and not simply the strength of the evidence. For example, *Russell* pointed out the potential difficulties in promptly obtaining counsel where a night-time arrest has occurred.

D

As I stated earlier, the above discussion is intended to stimulate further thought on this subject but is not necessary for resolution of the instant case because, even under the *Turner* rule, the on-the-scene identification of Marks was proper. At the time of Marks' arrest, the evidence against him was that he was seen standing close to an establishment within minutes after a silent alarm had been triggered, he ran when the police approached, and he had wood chips and white particles on his clothing. That Marks was present at the scene is difficult to explain away, but his later explanation that he was going to a party store with a "24 hour" sign out front is not inherently incredible. His flight is certainly some evidence of a guilty conscience, but, as far as the police were concerned, he could have felt guilty about something else. That Marks had wood chips and particles on his clothing is not of great value because it does not appear that the police knew how Jan's had been entered until later, when the owner's husband let them in and they found the hole in the ceiling. Accordingly, the evidence does not qualify as "very strong evidence" and the on-the-scene identification is not rendered unjustifiable.

Marks does not argue that the identification procedure was so suggestive as to render the on-the-scene identification unreliable. Because we find that identification proper, we need not reach the question of whether there was an independent basis for Mateen's in-court identification of Marks.

## II

Marks also argues that he was denied a fair trial by the people's failure to adequately preserve and test the wood chips and white particles found on his clothing. Defendant did not request that the evidence be preserved or tested. Because we do not find any intentional misconduct or suppression or bad faith on the part of the police or the prosecutor, defendant's argument is without merit. *People v Jeffrey Johnson,* 113 Mich App 650; 318 NW2d 525 (1982). The people did not have a duty to test the evidence. *People v Allen,* 351 Mich 535; 88 NW2d 433 (1958).

## III

Defendant Holmes first argues that the evidence against her was insufficient and that the court erred in denying her motion for a directed verdict. In reviewing this claim, we must view the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354; 285 NW2d 284 (1979), cert den 449 US 885; 101 S Ct 239; 66 L Ed 2d 110 (1980). In this case, the evidence was clearly sufficient to convict Holmes on an aiding and abetting theory. The jury could properly believe that Marks climbed to the roof of Jan's,

broke his way in, prepared certain items for removal and actually removed other items. Because there was other evidence from which the jury could believe that Holmes was with Marks immediately before the break-in and at the time the police arrived, and that Holmes fled from the police, the jury could conclude that Holmes shared Marks' felonious intent and participated in the crime. *People v Olszewski,* 119 Mich App 455; 326 NW2d 394 (1982). Compare the facts in *People v Henry,* 395 Mich 367; 236 NW2d 489 (1975).

IV

We lastly address Holmes' arguments that the court abused its discretion at sentencing. We find no basis for reversal.

Holmes first asserts that the court considered her failure to admit guilt, contrary to the clear rule stated in *People v Randle,* 104 Mich App 1; 304 NW2d 9 (1981). The record does not support this assertion. The court expressed a belief that Holmes was guilty but never intimated that Holmes' failure to admit guilt was a factor in determining her sentence.

Holmes next contends that the court erred in departing from the sentencing guidelines' recommended minimum range for reasons that were already factored into the guidelines' scoring system. This Court has consistently rejected this argument. See e.g., *People v Richard Johnson,* 146 Mich App 809; 381 NW2d 424 (1985).

Holmes lastly urges that, pursuant to *People v Coles,* 417 Mich 523; 339 NW2d 440 (1983), she should be granted relief because the court abused its discretion in focusing on an attitude problem Holmes had during the prebail investigation.

Holmes notes that, during the later presentence interview, she cooperated with the probation officer. We find no abuse of discretion to the extent that it shocks our conscience. 417 Mich 550.

Judges MACKENZIE and TAHVONEN concur in the results only as to Part I and concur fully with Parts II, III, and IV. As to the propriety of the on-the-scene identification procedure challenged by defendant Marks, they would apply the rule of *People v Turner*, 120 Mich App 23; 328 NW2d 5 (1982), lv den 417 Mich 1064 (1983), and *People v Fields*, 125 Mich App 377; 336 NW2d 478 (1983), and affirm.

Affirmed.